# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,

      v.                          Case No. 19-04090-01-CR-BCW

SHERRY K. PAULO,

                    Defendant.

## THE UNITED STATES' SENTENCING
## MEMORANDUM REGARDING SHERRY K. PAULO

The United States, by and through its counsel of record, the United States Attorney's Office for the Western District of Missouri and the Department of Justice Civil Rights Division (collectively, "the government" or "the United States"), submits this memorandum regarding the sentencing of Defendant Sherry K. Paulo. On November 22, 2019, Defendant Paulo pled guilty to an Information charging her with violations of 18 U.S.C. §§ 242 (death-resulting deprivation of rights under color of law) and 1347 (health care fraud). Doc. 7 (Information); Doc. 16 (Change of Plea). Sentencing in this matter is set for hearing on September 1, 2020, at 11:00 a.m.

Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), Defendant Paulo's Plea Agreement provides for a binding sentencing range of 168 to 210 months (14 to 17.5 years). Thus, if the Court accepts the Agreement, it must impose a sentence that includes a term of imprisonment within that range. The Court must also order five

years of supervised release, forfeiture, and restitution in the amount of $106,795.00. Doc. 14 at 6.

The United States respectfully recommends that the Court sentence Defendant Paulo to 210 months' (17.5 years') imprisonment. In light of Paulo's offense conduct, other conduct relevant to the Court's sentencing determination, the United States Sentencing Guidelines ("USSG" or "Guidelines"), and the 18 U.S.C. § 3553(a) factors, such a term of incarceration is appropriate and sufficient, but not greater than necessary, to achieve the purposes of sentencing.

## I. <u>Factual Summary</u>

The charges in this case arise from Defendant Paulo's conduct, in conjunction with other family members, leading and related to the death of victim C.D., a developmentally disabled ward of the state and Medicaid beneficiary under Paulo's care and supervision. At and around the time of his death, C.D. was a resident of Second Chance Homes ("SCH"), an individualized supported living center in Fulton, Missouri, that contracted with the Missouri Department of Mental Health to provide waiver services for Medicaid. Presentence Report ("PSR") at ¶ 4. Defendant Paulo worked at SCH as the Professional Manager. Her responsibilities included providing direct care to SCH residents and overseeing SCH's day-to-day operations. *Id.* at ¶ 5; Doc. 14 at 2. With regard to C.D. specifically, Defendant Paulo lived at C.D.'s designated SCH residence in order to supervise C.D. during the day and night. Doc. 14 at 2. She was responsible for taking C.D. to medical appointments and for administering any meal

supplements or medication prescribed to him.   PSR at ¶ 10.   Paulo further coordinated with Fulton County officials to determine C.D.'s course of care.   Doc. 14 at 2.

Several of Defendant Paulo's immediate family members also worked at SCH. Paulo's husband, Anthony Raymond Flores, her son, Anthony Raymond Kaulana ("R.K.") Flores, and her daughter, Mary Paulo, all worked as direct care staff members at SCH.   *Id.* at ¶ 6.   As such, they, too, came into contact with C.D. in their roles as caregivers.   Mirroring their internal family structure, in which Defendant Paulo was reportedly a controlling matriarch, each of these family members followed Paulo's orders in their professional capacities, as well.   PSR at ¶ 7.

C.D., who was in his early thirties at the time of his death, had lived at SCH since 2008.   He was developmentally disabled in all areas: he was small in size, largely non-verbal, and had been diagnosed with "moderate mental retardation."   *Id.* at ¶ 8. These conditions required constant, ongoing medical care and daily medications.   *Id.* at ¶ 9.   As C.D.'s direct care provider, tasked with observing and caring for him daily, Paulo was certainly aware of C.D.'s condition and his significant medical needs.

Beginning in 2014, C.D. struggled to maintain a healthy weight.   Defendant Paulo took C.D. to a doctor who prescribed him meal supplements.   She initially followed the prescribed regimen but stopped administering the supplements in 2015. Throughout the rest of 2015, and until C.D.'s death in 2016, Defendant Paulo chose not to provide the prescribed treatment for C.D.'s weight loss, instead watching as C.D. continued to lose weight.   Additionally, against doctors' orders, Paulo withheld C.D.'s

3

prescribed antipsychotic and anticonvulsant medications.   Exhibit G at 5-6 (portion of Defendant Paulo's April 18, 2017, FPD interview).

Ignoring her duties as C.D.'s caretaker, Defendant Paulo did not take C.D. to a doctor at any point after December 2015.   PSR at ¶ 10.   To cover up the fact that C.D. was not receiving medical treatment, Paulo falsified C.D.'s medical and SCH records. The falsifications were extensive: starting as early as May 2016, Paulo created records for six doctors' appointments that did not, in fact, take place.   In those falsified records, Defendant Paulo forged signatures and invented details about C.D.'s progress and regressions.   *Id.*   She went so far as to instruct her daughter, another SCH employee, to take C.D.'s developmentally disable housemate to a medical appointment in C.D.'s stead, presenting that resident as if he was C.D. and obtaining a prescription for C.D., which she then chose not to administer.   *Id.* at ¶ 21; *United States v. Mary Paulo*, Case No. 20-CR-4027-BCW, Doc. No 13 at 2-3.   At the time Defendant Paulo engaged in this conduct, she observed the actual state of C.D.'s health noticeably decline.

Throughout this time period, Defendant Paulo repeatedly took C.D. and his housemate out of SCH without authorization and placed them in the unfinished basement of her personal home.   PSR at ¶¶ 8-13.   According to co-defendant Anthony Flores (Paulo's husband), Paulo refused to allow the two men out of the basement, claiming that she did not want C.D. to soil himself and spread feces around her house. *Id.* at ¶ 13.

By September 2016, C.D.'s health declined to such a degree that he would lie in bed howling. When another SCH resident complained about C.D. making noise at night, Defendant Paulo permanently moved C.D. and his housemate to the basement of her home. C.D. was confined to a makeshift room that could be locked from the outside. *Id*. The room was small and dark, with no access to running water, sunlight, or fresh air. *See* Exhibit A (photograph of basement room). Co-defendant Flores described it as a "jail cell." PSR at ¶ 13. Unsurprisingly, C.D.'s health continued to decline under these conditions. He soon became unable to swallow and refused to eat. Defendant Paulo personally observed C.D.'s deterioration but, concerned less about C.D. and more about getting in trouble for C.D.'s poor health, she refused to get him medical care. *Id.*

C.D. remained in Defendant Paulo's basement until his death in approximately September 2016.[1] Paulo and co-defendant Flores provided differing accounts of C.D.'s death to law enforcement. Although Paulo initially claimed that she was feeding C.D. when he slipped into respiratory distress, both Paulo and her husband ultimately claimed to be home alone (without the other) and to have heard C.D. howling or screaming in the basement. They each claimed to have acted alone in enlisting C.D.'s housemate to carry C.D. upstairs to a bathroom and to place C.D. under running water. Flores claimed that he called Defendant Paulo and told her what was happening only after taking C.D. to the bathroom. *Id*. at ¶¶ 16-18. Defendant Paulo described that,

---

[1]     Due largely to the defendant's obstructive conduct, detailed below, the precise date of C.D.'s death remains unknown.

5

after running water over C.D. in the bathroom herself, she saw C.D. stop breathing and lose his pulse. Both Defendant Paulo and her husband admitted that Paulo, who was trained in CPR and first aid, did not attempt to resuscitate C.D. while watching him die. Paulo further refused to call for an ambulance and did not take C.D. to the hospital that was minutes away from her house, purportedly out of fear that she would be blamed for C.D.'s malnourishment and death. *Id.* at ¶ 15.

Paulo and Flores left C.D.'s body in the bathtub for several days. As the smell of C.D.'s deceased body grew stronger, Defendant Paulo, with the help of Flores and C.D.'s housemate, wrapped the body in plastic, stuffed it into a trash can, placed the trash can into a wooden crate constructed by Flores, and filled the crate with concrete. *See* Exhibit B (photographs of trash can filled with concrete). Paulo, her husband, her son, and C.D.'s housemate then transported the crate to Paulo's storage unit.

In addition to physically concealing C.D.'s body, Defendant Paulo took extraordinary subsequent measures to cover up C.D.'s death. Paulo forged and falsified much of C.D.'s medical documentation, including his medication administration records and daily progress notes. *Id.* at ¶¶ 19-21. Those falsifications were painstaking: Defendant Paulo went so far as to document fictitious details of C.D.'s everyday life in his medical progress reports. For instance, she concocted anecdotes about C.D. snacking (C.D "indicated he wanted an orange for his snack. . . . After eating his snack, [C.D.] put his dishes in the sink and brushed his teeth with 1 verbal prompt from the staff to do so," Exhibit C at 1) or listening to music (C.D. "indicated he would

6

like to listen to music by pointing to the TV and dancing. I asked [C.D.] if he would like to listen to music and [C.D.] said 'yeah!'" *id.* at 2). On April 16, 2017—the day before she falsely reported C.D. missing, but long after C.D. had died—Paulo included a lengthy narrative in C.D.'s progress report that detailed things like C.D.'s multiple attempts to walk into the street that day, or what he ate for Easter dinner. *See id.* at 3 ("[C.D.] gasped and said 'uh oh. No. Nope. Nuh-uh' but would continue to attempt to rush to the street when he thought no one was looking."); *id.* ("[C.D.] ate plenty of food and had 2 extra helpings of hot dogs and macaroni salad at [C.D.]'s request.").

When county inspectors arrived at C.D.'s residence to check on C.D., Defendant Paulo had C.D.'s housemate lie in C.D.'s bed to trick the inspectors into thinking C.D. continued to sleep there. She also used C.D.'s Electronic Benefits Transfer card to make it appear that C.D. had purchased groceries. And she continued to create false records for C.D.'s doctor's visits. PSR at ¶ 21. To those who inquired of C.D.'s whereabouts, Paulo falsely claimed that C.D. was with other caretakers. *See* Exhibit D at 2, 5 (Fulton Police Department interview reports of SCH staff). Between September 2016 and April 2017, when C.D. was already dead, Paulo caused false claims in the amount of $106,795 to be submitted to Medicaid for services purportedly provided to C.D. PSR at ¶ 25.

It was not until April 17, 2017, when another company was scheduled to inspect and take over SCH, that Defendant Paulo was forced to admit C.D. was not physically present at SCH. Even then, she attempted to conceal her criminal conduct through a

7

series of lies. Paulo reported C.D. missing to the Fulton Police Department, falsely claiming that she had seen C.D. in bed early on April 17 but that he had walked out of SCH by 7:00 a.m. that day. In an attempt to corroborate this fabricated story, Defendant Paulo instructed her husband, her son and his girlfriend, and her daughter to lie to the police as well, falsely claiming that C.D. had attended their family Easter celebration on April 16, 2017. When interviewed by Fulton Police investigators, Paulo's family members provided that fictitious narrative. *Id.* at ¶¶ 22-23.

The Fulton police ultimately located C.D.'s body on April 23, 2017, based on an interview with C.D.'s housemate. Crediting the housemate's account of his participation in hiding the body, investigators discovered C.D.'s body in a trash can entombed in concrete, hidden in Paulo's storage unit in Fulton. *Id.* at ¶ 24. Finally, and only when confronted by the police, Defendant Paulo acknowledged her role in C.D.'s death. *Id.* at ¶ 22 (Paulo provided false information to investigators in April 17, 2017, interview); Exhibit D at 8-9 (when confronted by Fulton Police investigators, during her fourth interview with them, Paulo admitted C.D.'s body was hidden in her storage unit). Like her other attempts to conceal and avoid responsibility for her crimes, Paulo's disclosures came only when it was inevitable that her misdeeds would be discovered. Such conduct not only delayed the prompt discovery, investigation, and prosecution of Paulo's criminal conduct, but it also precluded C.D.'s family and community from learning of and mourning his death in a timely manner.

On June 5, 2018, the Callaway County, Missouri Prosecuting Attorney's Office charged Paulo with involuntary manslaughter and several other state law violations for her conduct related to C.D.'s death. PSR at ¶ 27; *see* Callaway County Circuit Court Case No. 18CW-CR00833.

## II. <u>Sentencing Guidelines</u>

The U.S. Probation Office ("USPO"), in its Presentence Report ("PSR"), submits a Total Offense Level of 43, with a Criminal History Category I, and an advisory Guidelines sentence of life imprisonment. PSR at ¶¶ 57, 62, 92. It reaches these calculations after cross-referencing the Guideline for second-degree murder (as agreed upon by the parties) and determining a base offense level of 38.[2] The USPO then applies sentencing enhancements for acting under color of law (+6); vulnerable victim (+2); Paulo's leadership role (+2); obstruction of justice (+2); monetary loss greater than $95,000 (+8); using sophisticated means (+2); and abusing a position of trust (+2). *Id.* at ¶¶ 38-49. Neither the United States nor Defendant Paulo objected to the PSR.

---

[2]     As the parties stipulated in the Plea Agreement, the PSR concluded that the appropriate base offense level is found here by first referring to Sentencing Guideline § 2H1.1, which governs offenses (such as violations of 18 U.S.C. § 242) that involve individual rights. Section 2H1.1(a)(1) dictates that where a cross-reference to the underlying offense would result in a higher offense level than otherwise provided, the cross-reference applies. Here, Defendant Paulo pled guilty to a death-resulting deprivation of rights and, as Defendant Paulo further stipulated, her underlying conduct for that violation constitutes second-degree murder: the unlawful killing of C.D. with malice aforethought. *United States v. Contreras*, 816 F.3d 502, 508 (8th Cir. 2016) (citing *United States v. Downs*, 56 F.3d 973, 974 (8th Cir. 1995)). "Malice aforethought" includes "an intent willfully to act in callous and wanton disregard of the consequences to human life." Model Crim. Jury Instr. 8th Cir. 6.18.1111A-1 (2017). In turn, "callous and wanton disregard" is further defined to include "conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm." *Id.* (citing *United States v. Johnson*, 879 F.2d 331, 334 (8th Cir. 1989) (quotations omitted)). Accordingly, Sentencing Guideline § 2A1.2, which applies to second-degree murder, governs here and provides a base offense level of 38.

9

Three of these enhancements bear particular mention, as they reflect especially serious and troublesome aspects of this case. First, C.D.'s significant physical and mental limitations call for application of the vulnerable victim enhancement. USSG § 3A1.1(b) (two-level increase where a defendant "knew or should have known that a victim of the offense was a vulnerable victim[.]"). Application Notes to Guidelines Section 3A1.1 define "vulnerable victim" as any victim "who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." USSG § 3A1.1 comment (n.2). It is undisputed that C.D.'s condition and circumstances left him particularly vulnerable to Defendant Paulo's crimes, and that Paulo knew or should have known of those vulnerabilities. As Defendant Paulo admitted in the factual basis for her plea, "C.D. was a developmentally disabled Medicaid beneficiary" who was also a ward of the state. Doc. 14 at 2. He was largely non-verbal and incapable of dressing, feeding, or otherwise caring for himself. In the time leading up to his death, C.D. grew weaker and rapidly lost weight. His circumstances exacerbated these conditions: C.D.'s limited access to individuals outside SCH, particularly once Defendant Paulo placed him in her basement, provided little opportunity for others to discover his deteriorating condition and abhorrent treatment. Paulo was C.D.'s primary caregiver, and C.D.'s housemate (the only other person who stayed with C.D. in the basement) was significantly disabled himself. Together, these limitations left C.D. unable to protest his abuse, to call for help, or to secure for himself the medical care that Defendant Paulo denied him.

10

Second, Guidelines Section 3B1.1(c) provides for a two-level enhancement where, as here, a defendant was an organizer, leader, manager, or supervisor in any criminal activity. "Each of these four terms is construed broadly." *United States v. De Oliveira*, 623 F.3d 593, 599 (8th Cir. 2010). As the Guidelines note, a court should consider "the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices . . . the nature and scope of the illegal activity, and the degree of control and authority exercised over others." USSG § 3B1.1, comment (n.4). It is further "only necessary that the defendant supervise or manage one other participant" to meet the Guidelines' terms. *United States v. Gamboa*, 701 F.3d 265, 267 (8th Cir. 2012).

Defendant Paulo held the title of "manager" at SCH. Her responsibilities included the day-to-day care of C.D. In that capacity, Paulo enlisted the help of several employees/family members in victimizing one of society's weakest and most vulnerable members. Utilizing her authority as the family matriarch and SCH manager, Paulo directed and coordinated her family members' actions while purposefully depriving C.D. of the care he required and while attempting to conceal the evidence of those deprivations. Paulo removed C.D. from his SCH residence and, along with her husband and co-defendant, concealed C.D. in the basement of her personal home. She further recruited her husband, son, and daughter (all SCH employees) to help cover up C.D.'s death by hiding his cement-encased body in a storage unit, securing medical prescriptions in C.D.'s name, and lying to local law enforcement. Paulo solely or jointly

11

made every major decision leading to and concealing C.D.'s death: to place C.D. in her basement; to not call 911, to move C.D.'s body to her storage unit, to falsify C.D.'s medical records, and, ultimately, to report C.D. missing and then lie about his whereabouts on Easter 2017. Such circumstances and actions, taken together, qualify Defendant Paulo as an organizer, leader, manager, or supervisor of the criminal activity surrounding C.D.'s death.

Third, as the PSR determined, Defendant Paulo's extensive coverup included forged records, lies to law enforcement officers, and orders to her fellow SCH employees to lie, thus warranting a two-level obstruction enhancement. USSG § 3C1.1; PSR at ¶ 41. Paulo's obstruction of justice was prolonged and sought to render C.D.'s murder unsolvable. Indeed, though law enforcement ultimately located C.D.'s body, months in a cement-encased trash can had caused C.D.'s remains to decompose almost entirely, leaving his precise cause and time of death indeterminable. *See* Exhibit E (final diagnoses from C.D. autopsy report, noting "severe decomposition" and undetermined cause of death). Furthermore, that Paulo enlisted her own family members and C.D.'s developmentally disabled housemate undoubtedly facilitated the concealment of her crimes: the primary witnesses to Paulo's criminal conduct were largely under her influence, care, and/or control. Together, Paulo's obstructive acts adversely impacted the evidence available for a criminal investigation into C.D.'s death,[3] prevented C.D.'s

---

[3] These aspects of the case continue to impact the investigation and prosecution of C.D.'s homicide by limiting the available testimonial and physical evidence available should this case have proceeded to trial.

family and community from discovering and/or mourning his death in a timely fashion, and permitted Paulo to continue to defraud public funds.

A high-end sentence accounts for the multiple sentencing enhancements that apply in this case: Defendant Paulo's callous disregard of an extremely vulnerable victim's medical needs; her abuse of state-sanctioned authority and access to C.D.; her dominant role in the criminal conduct coupled with her unique degree of authority and control within her family and at SCH; and the extent to which she tried to cover up her crimes and instructed others to do the same. Accordingly, the Court should accept the Plea Agreement in this case and sentence Defendant Paulo to 210 months' imprisonment, at the high end of the agreed-upon sentencing range.

## III.  Section 3553 Factors

The Government's recommended 210-month sentence lies at the upper end of the Rule 11(c)(1)(C) sentencing range provided in Defendant Paulo's Plea Agreement. (Doc. 14 at ¶ 6). That agreed-upon range resulted from extensive discussions between the parties, review of voluminous discovery, consideration of relative culpability for all individuals involved in these crimes, and attention to the § 3553(a) factors.

A sentence at the top of that range will produce a just result in this case. There is no question that the defendant bore primary responsibility for C.D.'s care, or that she knew and understood C.D.'s physical and mental limitations. C.D.'s physical decline and his death occurred under her watch and as a result of her purposeful inaction.

13

For the reasons discussed below, and in light of this offense conduct as well as the applicable Guidelines and enhancements, a sentence of 210 months' (17.5 years') imprisonment is sufficient, but not greater than necessary, to reflect the seriousness of the offense as well as the defendant's history and characteristics; to afford adequate deterrence and protect the public from further crimes of the defendant; and to provide just punishment while avoiding unwarranted sentencing disparities. 18 U.S.C. § 3553(a).

## A. The Nature and Seriousness of the Offense

First, the Government's recommended sentence will reflect the uniquely heinous nature and seriousness of Defendant Paulo's offense. Paulo's treatment of C.D. exposed how she viewed him: as less than human; as someone whom she could allow to languish and then discard in a trash can. Paulo acted from a position of near-absolute power over a victim who could neither advocate nor care for himself. She controlled what he ate, what medications he took, and whether he received treatment from a doctor. Through the medical progress reports Paulo submitted, she controlled the narrative around C.D.'s condition and the public perception of his health. As a result, Paulo's actions did not *just* victimize C.D. in a particularly shocking manner. They also broke this community's trust in its caregivers—as reflected in the outcry over C.D.'s death—and defrauded the state of Missouri and Medicaid in the process. Indeed, in statements that the government expects they will also convey to the Court, C.D.'s aunt and brother each requested the maximum sentence permitted under the Plea

14

Agreement for all defendants in this case. C.D.'s aunt additionally expressed her dismay that C.D. suffered at the hands of those whose very job was to care for him, and C.D.'s brother described his and his mother's anger and depression over the circumstances of C.D.'s death. *See* Exhibit F (victim impact statements).

## B. Defendant's History and Characteristics

A sentence of 210 months' imprisonment also accounts for Defendant Paulo's history and characteristics. Paulo is generally physically healthy, with no significant criminal history. She has not been diagnosed with any mental or emotional health problems, although the PSR notes that as a child, Paulo suffered repeated abuse at the hands of her father, for which she has never received treatment or counseling. PSR at ¶¶ 67, 75. Upon sentencing, Defendant Paulo will be 55 years old. Thus, even a lengthy term of incarceration short of a life sentence will be significant. Indeed, at the conclusion of the Government's recommended 210-month sentence, at the high end of the agreed-upon range, the defendant will be approximately 72 years old and will remain under supervised release for the following five years. The sentencing range and recommendation thus accounts for the likely impact of incarceration on a defendant of Paulo's age.

## C. Promote Respect for the Law, Afford Adequate Deterrence, and Protect the Public

The recommended sentence is necessary to promote respect for the law, while protecting the public from further crimes of the defendant and encouraging both specific

15

and general deterrence. Defendant Paulo's criminal conduct and attempts to conceal her crimes suggest a lack of remorse and show that a lengthy sentence addressing each of these goals is necessary in this case.

Paulo's multiple offenses evince her disrespect for the law. Over the course of a prolonged period, she intentionally deprived a developmentally disabled man of the medications and care necessary to treat his serious health conditions, thereby leading to his death. Paulo then engaged in a complicated coverup to avoid getting in trouble for her actions. She took great pains to falsify official medical documentation, including great levels of detail in those documents to give state and Medicaid authorities the false impression that C.D. was healthy. She lied directly to law enforcement about her involvement in C.D.'s death. And she directed others to engage in criminal conduct, as well, by providing similar lies to bolster her own false account. In committing one crime after another, Defendant Paulo allowed C.D. to die and attempted to avoid responsibility for his death. By establishing significant consequences for Defendant Paulo's multiple, serious crimes, a 210-month (17.5-year) term of incarceration will promote respect for the law.

Such a sentence will also protect the public by preventing Paulo from engaging in further criminal activity and precluding future employment as a caregiver at a place like SCH. This is important where, as here, the defendant has shown little remorse for the victim in this case. As C.D. languished in Defendant Paulo's basement, and even as he lay dying in the bathroom of her home, Paulo's self-interests remained her primary

16

concern. PSR at ¶ 13 (Paulo declined her husband's suggestion to move C.D. out of the basement because she worried he would make a mess in her house); *id.* (Paulo did not seek medical attention for C.D.'s rapid health decline because she was afraid she would get in trouble); *id.* at ¶ 15 (Paulo did not call for an ambulance because she did not want to be blamed for C.D.'s death). A long period of incarceration will convey to Defendant Paulo that she cannot prey on the weakest in society and cover it up with impunity, and it will prevent her from doing so again.

Equally (if not more) critical, a significant sentence will produce a strong general deterrent effect. Defendant Paulo engaged in a protracted series of civil rights, health care fraud, and obstruction crimes in conjunction with various members of her family. Those crimes impacted SCH staff and residents, as well as the Fulton and Callaway County, Missouri communities more broadly. The crimes engendered significant local outcry and received extensive publicity. As a result, the Government's recommended sentence will convey that such violations of the law carry very real penalties, and that this Court will seek to protect members of the vulnerable and marginalized communities that Defendant Paulo targeted. It will further dissuade others who might consider taking advantage of people, like C.D., who must rely on the care provided by state-supported programs and individuals.

17

## D. Provide Just Punishment and Avoid Unwarranted Sentence Disparities

Finally, a 210-month (17.5-year) sentence will provide just punishment for Defendant Paulo's crimes and avoid unwarranted disparities between Paulo's sentence and those of similarly-situated defendants. *See* 18 U.S.C. § 3553(a)(2), (a)(6). The recommended sentence accounts for the severity of the Paulo's crimes while acknowledging that the facts and charged conduct in this case are thankfully rare.

With few analogous cases, Defendant Paulo's conduct and sentence is appropriately evaluated against those of her family members who also participated in the charged criminal activity. As this Court is aware, Paulo's husband, son, and daughter have each pled guilty to various charges stemming from C.D.'s death. Of note, Paulo's husband, Anthony Flores, has pled guilty to an identical death-resulting civil rights violation for his deliberate indifference to C.D.'s serious medical needs. *United States v. Paulo et al*, No. 20-cr-4090-BCW, Doc. 16 (Paulo and Anthony Flores change of plea hearing); *United States v. Flores*, No. 20-cr-4011-BCW, Doc. 9 (Anthony R.K. Flores change of plea hearing); *United States v. Mary Paulo*, No. 20-cr-4027-BCW, Doc. 11 (Mary Paulo change of plea hearing). But Defendant Paulo's conduct was the most egregious of all her family members. Paulo was most familiar with C.D.'s medical conditions, mental health status, and required medications. By virtue of her job title and duties, she bore the greatest responsibility for C.D.'s care. Her efforts to conceal C.D.'s physical condition, and his ultimate death, were most extensive and included the

18

actions that now leave her convicted also of health care fraud. Paulo lied to the police to avoid accountability, and she instructed her family members—who viewed her as an authority figure both at home and at SCH—to lie to law enforcement as well. From beginning to end, Defendant Paulo played a central role in bringing about, and covering up, C.D.'s decline and eventual death.

It is notable that Defendant Paulo's guilty plea to federal charges, pursuant to the Plea Agreement, will also resolve the pending state charges against her for abuse or neglect, involuntary manslaughter, abandonment of a corpse, and false reporting. As noted in the PSR, the Callaway County Prosecuting Attorney has expressed that he intends to dismiss those charges following Paulo's sentencing in federal court. PSR at ¶ 64. Defendant Paulo's guilty plea and sentencing in this matter thus effectively serve to resolve all criminal charges against her stemming from C.D.'s death.

Accordingly, while the sentencing range set forth in the Plea Agreement accounts for the unique course of criminal conduct in this case, the Government's recommended sentence at the top of that range reflects Defendant Paulo's great responsibility for that conduct as well as the resolution of serious federal and state charges against her. Justice requires that Paulo serve a significant prison term.

## IV.     Recommended Sentence for Monetary Penalties

Defendant Paulo has also pled guilty to health care fraud. The Court should thus require her, as a condition of her sentence, to pay $106,795.00 in restitution to

Medicaid (the MO HealthNet Fraud Reimbursement Fund).[4]  Pursuant to 18 U.S.C. § 982(a)(7), the United States seeks a forfeiture money judgement against Paulo in the amount of $106,795.00.   As the PSR found that Paulo does not have the means to pay a fine within the Guidelines' range, PSR at ¶ 89, the United States does not request that the Court impose a fine.

## V.     Conclusion

Because of Defendant Paulo's deliberate indifference to C.D.'s medical needs, C.D.'s last hours were spent, in part, howling in a "jail cell" of the unfinished basement of Paulo's home.   And because of Paulo's extensive efforts to conceal C.D.'s deteriorating health and eventual death by falsifying numerous documents, lying, and directing others to lie, C.D.'s whereabouts were unknown to his family, his doctors, and to many other SCH staff members for months after his death.   Defendant Paulo should bear the consequences of these crimes by serving the maximum prison term set forth in the Plea Agreement.

The United States respectfully requests that the Court accept the parties' Rule 11(c)(1)(C) plea agreement and enter a judgment and orders as set forth therein, and impose a sentence of imprisonment of 210 months (17.5 years), five years of supervised release, forfeiture, and restitution in the amount of $106,795.00.

_____

[4]     Address:
       MO HealthNet Fraud Reimbursement Fund
       Attn:   Medicaid Fraud Control Unit
       P.O. Box 899
       Jefferson City, MO 65102

Respectfully submitted,

Timothy A. Garrison
United States Attorney

_/s/ Lucinda S. Woolery_

By  Lucinda S. Woolery
Gregg R. Coonrod
Assistant United States Attorneys
Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone:   (816) 426-3122

Eric S. Dreiband
Assistant Attorney General

_/s/ Julia Gegenheimer_

By  Julia Gegenheimer
Special Litigation Counsel
Janea Lamar
Trial Attorney
Civil Rights Division
950 Pennsylvania Avenue NW
Washington, DC 20530

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on August 21, 2020, to the CM/ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

/s/ Julia Gegenheimer
JULIA GEGENHEIMER
Special Litigation Counsel